UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARK ALLEN SELLERS,

                Petitioner,                                Hon. Gordon J. Quist

v.                                                     Case No. 1:13-CV-24

KENNETH McKEE,

                Respondent.
_____/


**REPORT AND RECOMMENDATION**

This matter is before the Court on Sellers' petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Sellers' petition be **denied**.


**BACKGROUND**

As a result of events which occurred in the summer of 2004, Petitioner was charged with two counts of First Degree Criminal Sexual Conduct and one count of Second Degree Criminal Sexual Conduct. (Trial Transcript, November 19, 2008, 8-9). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Susan Sellers**

Sellers married Petitioner in January 2000.  (Trial Transcript, November 19, 2008, 139-40).  When the pair married, Sellers had three children from a previous relationship.  (Tr. 140-41).  The youngest of these three children, A.M., was born in July 1998.  (Tr. 140-41).  Following their marriage, Sellers and Petitioner had a child, A.S., who was born in April 2002.  (Tr. 140-42).  The couple divorced in 2005.  (Tr. 140).

In June 2004, Sellers accompanied her eldest daughter on a seven day "dance camp" trip to Pennsylvania and New York.  (Tr. 143-44).  Petitioner remained home with the three younger children.  (Tr. 144).  At the time of this dance camp trip, Petitioner, Sellers, and their children were living at 7422 Maple Street, Eau Claire, Michigan.  (Tr. 141, 145).  The family lived in a five-bedroom house.  (Tr. 145-47).  The four children each had a separate bedroom on the second story and Petitioner's bedroom was on the ground floor.  (Tr. 147-48).  While the children might occasionally enter their parents' bedroom if they "woke up with a bad dream or something," the children "never slept with" Sellers and Petitioner.  (Tr. 149-50).

When Sellers returned home from the dance camp trip, neither Petitioner nor A.M. reported the occurrence of anything unusual during Sellers' absence.  (Tr. 150).  In June 2008, however, Sellers learned that "something had happened" while she had been away on the dance camp trip.  (Tr. 150-51).  Specifically, Sellers was contacted by the pastor at a camp A.M. was attending.  (Tr. 151).  Sellers was informed that A.M. had informed one of her counselors that Petitioner "had sexually assaulted her."  (Tr. 152).  After learning of this, Sellers spoke with an attorney who instructed Sellers to "just let [A.M.] tell [Sellers] what she felt comfortable telling [her]."  (Tr. 152).  Sellers complied with this instruction after which Sellers contacted Child Protective Services.  (Tr.

152-53).  As a result of the matter being reported to Child Protective Services, A.M. was examined at the Child Assessment Center.  (Tr. 153-54).

Following their divorce in 2005, Sellers and Petitioner did not experience custody disputes or other disagreements, but Petitioner was not granted visitation rights as to Sellers' three other children.  (Tr. 155-56).  As of June 2008, Petitioner had twice weekly visitation with A.S. and spoke with her regularly on the telephone.  (Tr. 154-55).

**A.M.**

A.M. was born in July 1998 and was presently 10 years of age.  (Trial Transcript, November 19, 2008, 176-77).  When A.M.'s mother and older sister went to "dance camp," A.M. was "5 turning 6" years of age.  (Tr. 178).  While A.M.'s mother and older sister were away, Petitioner "made [A.M.] have sex with him."  (Tr. 181).

On the night in question, Petitioner awoke A.M. and led her downstairs where the pair watched a movie "with girls and guys undressing."  (Tr. 182-83).  After the movie was over, A.M. returned to her bed and fell asleep.  (Tr. 183-84).  A.M. later experienced a "bad dream" after which she walked down to Petitioner's room "to see what I could do."  (Tr. 184).  At that time, A.M. was wearing pajamas.  (Tr. 184).  Petitioner told A.M. that she "could sleep with him" at which point A.M. "crawled in the bed with him" and "went to sleep."  (Tr. 184).

When A.M. later awoke, she and Petitioner were both "undressed."  (Tr. 184-85). Petitioner then began "rubbing all over [A.M.'s] body" with his hand penetrating her "private part" in the process.  (Tr. 185-87).  Petitioner then began touching A.M. with his "boy part" and licking A.M.'s "private parts."  (Tr. 187-94).  Petitioner then forced A.M. to "touch" and "lick" his "private

3

parts." (Tr. 195-97). Petitioner later threatened to "kill" A.M. if she ever told anybody what he had done. (Tr. 198-99). A.M. did not tell her mother what occurred because she was "scared" and "didn't know how she was going to react." (Tr. 201). A.M. eventually told her Aunt Jo Jo what Petitioner had done to her. (Tr. 202-03). A.M. asked Jo Jo not to tell her mother because she was "still scared." (Tr. 203). While at camp earlier that summer, A.M. told a camp counselor what Petitioner had done. (Tr. 203-04). A.M. later met with the camp pastor and told him what Petitioner had done. (Tr. 204).

**Barbara Welke**

Welke was a forensic interviewer for the Children's Assessment Center of Berrien County. (Trial Transcript, November 20, 2008, 39). In this capacity, Welke conducted a forensic interview of A.M. (Tr. 57-58). Welke indicated that it is not unusual for children to delay reporting sexual abuse. (Tr. 51-57).

**Laurajo Morrow**

Morrow is Susan Sellers older sister. (Trial Transcript, November 20, 2008, 71). Morrow and A.M. are "pretty close" and A.M. visits Morrow "often." (Tr. 71-72). Several weeks after Sellers and A.M.'s sister went on the dance camp trip, A.M. told Morrow that Petitioner "hurt her" and was "mean to her." (Tr. 73). A.M. did not share any specifics and Morrow did not ask A.M. to provide any. (Tr. 73-74). Morrow could discern that A.M. was upset, but Morrow was concerned that if she questioned A.M. it would "upset her more." (Tr. 75). Morrow thought that A.M. was upset because it "was an adjustment for [Petitioner] being in their household, being her

4

new step dad; that he had different rules for them." (Tr. 75-76). A.M. did not tell Morrow that Petitioner "had sex with her." (Tr. 76).

**Debbie Shembarger**

From approximately May 2004 through May 2006, A.M. was a client at Shembarger's day care facility. (Trial Transcript, November 20, 2008, 86). Shembarger discharged A.M. from her day care because "[A.M.] and another little girl kept talking about sex and. . .kissing boys and babies and. . .the other young ladies['] mother[s] kept complaining." (Tr. 87). A.M. was "having a very difficult time; crying a lot." (Tr. 87). A.M. also "twice pulled down the underwear of. . .a little two and a half-year old, and. . .finally, it just got to the point that I let both girls go." (Tr. 87).

**Debra Layman**

Layman lived next door to the Sellers family on Maple Street in Eau Claire, Michigan. (Trial Transcript, November 20, 2008, 90-91). During this time, A.M. would visit Layman and the pair would "hang out" and "bake cookies" or perform housework together. (Tr. 91). A.M. never told Layman that she had been sexually abused by Petitioner. (Tr. 92).

**Juan Mata**

Following A.M.'s allegations against Petitioner, Mata, a Detective with the Village of Eau Claire, interviewed Petitioner. (Trial Transcript, November 20, 2008, 94-95). While Petitioner was not under arrest, Detective Mata nevertheless informed Petitioner of his Miranda rights after which he agreed to speak with Mata. (Tr. 95-96).

When questioned about A.M.'s allegations, Petitioner stated that he did "recall there was a time that - that my wife ended up leaving for a week and that was to New York." (Tr. 98-99). Petitioner confirmed that while his wife was away on this trip, he "was alone with the younger three children." (Tr. 99). Petitioner was then shown a recording of A.M.'s interview at the Children's Assessment Center. (Tr. 99). In the midst of viewing this recording, Petitioner stated, "turn it off; I don't want to listen to it. Uh - it didn't happen. I don't remember anything." (Tr. 99). Petitioner later acknowledged that on one occasion A.M. "was found in his bed" and they were both "naked." (Tr. 99). When asked to explain this circumstance, Petitioner responded that "he was taking medication at that time" which "made him feel funny." (Tr. 100). When asked "what had happened or why he was naked with [A.M.] in his bed," Petitioner responded that "he did not remember." (Tr. 100). Petitioner made no other statements and offered no further explanation regarding A.M.'s allegations. (Tr. 100).

**James Seitz**

Seitz was incarcerated with Petitioner in the Berrien County Jail following Petitioner's arrest. (Trial Transcript, November 20, 2008, 145-46). Seitz had previous experience working as a paralegal in a prison law library. (Tr. 147). In early October 2008, Petitioner asked Seitz to "help him go over his case." (Tr. 148-50). Seitz agreed to assist Petitioner on the ground that he was "completely honest" with him about his conduct. (Tr. 150). Petitioner agreed and told Seitz that he sexually assaulted A.M. (Tr. 150-52).

**Cory Peek**

As of December 30, 2007, Peek was employed as a Deputy for the Berrien County Sheriff's Department.  (Trial Transcript, November 21, 2008, 14-15).  On this day, Deputy Peek was dispatched to investigate an allegation that Susan Sellers' son had been "roughhousing" with Petitioner's young daughter causing injury.  (Tr. 15-18).  This situation did not involve A.M. and did not concern her allegations against Petitioner.  (Tr. 18).

**Charles Wooten**

Wooten previously worked as a pastor at a church which Petitioner attended with Susan Sellers and their children.  (Trial Transcript, November 21, 2008, 20).  Both parents participated in the discipline of the children who were "generally well behaved."  (Tr. 20).  Petitioner, however, was considered to be "strict when it came to discipline."  (Tr. 21-22).

Following the presentation of evidence, the jury found Petitioner guilty on all three charges.  (Trial Transcript, November 21, 2009, 92-93).  Petitioner was sentenced to serve 15-30 years on the First Degree Criminal Sexual Conduct convictions and a lesser sentence on the Second Degree Criminal Sexual Conduct conviction.  (Sentencing Transcript, January 5, 2009, 22-23).  Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I.    The prosecutor's summation misconduct denied Defendant-Appellant Mark Sellers due process and a fair trial.

II.   The prosecution's misconduct [and] blatant disregard of false and conflicting testimonies denied Defendant-Appellant due process and a fair trial.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Sellers*,

7

Case No. 290187, Opinion (Mich. Ct. App., April 27, 2010).  Asserting the same issues, Petitioner

unsuccessfully moved in the Michigan Supreme Court for leave to appeal.  *People v. Sellers*, Case

No. 141205, Order (Mich., September 9, 2010).  Petitioner subsequently moved in the trial court for

relief from judgment asserting the following claim:

> I.    Petitioner was denied the right to the effective
> assistance of counsel by both trial and appellate
> counsel.
>
>> A.    Trial counsel abandoned Petitioner's
>> defense mid-trial based on objectively
>> unreasonable decisions which would
>> likely have caused Defendant to be
>> acquitted.
>>
>> B.    Appellate counsel refused to seek a
>> Ginther hearing so the issues could be
>> presented to the trial court even
>> though he was aware based on his
>> own investigation of the existence of
>> the uncalled alibi witnesses.

The trial court denied Petitioner's motion.  *People v. Sellers*, Case No. 2008411644-

FC, Opinion and Order (Berrien Cnty Trial Ct. - Criminal Division,, January 27, 2012).  Asserting

the same claim, Petitioner moved in the Michigan Court of Appeals for leave to appeal.  Petitioner's

request was denied "for failure to meet the burden of establishing entitlement to relief under MCR

6.508(D)." *People v. Sellers*, Case No. 309371, Order (Mich. Ct. App., June 13, 2012).  Petitioner's

subsequent motion in the Michigan Supreme Court for leave to appeal was denied because Petitioner

"failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v.

Sellers*, Case No. 145444, Order (Mich., November 20, 2012).  Petitioner initiated the present action

on January 9, 2013, and on February 20, 2013, submitted an amended petition in which he asserts

the following issue:

> I.  Ineffective assistance of appellate counsel.  Trial attorney failed to investigate an alibi defense he was aware of and that the prosecution charges the wrong date.  Three witnesses including a medical doctor would have supported the alibi placing Defendant in the Detroit area when offense occurred.  Attorney should also have objected to motion to change date at conclusion of People's proofs.  Appellate attorney refused to raise this issue at a *Ginther* hearing.

## STANDARD OF REVIEW

Seller's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307.

10

Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007). This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been

presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

Petitioner argues that he was denied the right to the effective assistance of counsel both at trial and on direct appeal. To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689). Petitioner's

burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one." *Premo*, 562 U.S. at 122. Likewise, the standard by which petitions for habeas relief are judged is "highly deferential." Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential. *Id.* (citations omitted). As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The

question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.      Trial Counsel

Petitioner argues that his trial counsel's performance fell short in two distinct ways. First, Petitioner argues that his attorney should have presented an alibi defense. Petitioner also faults his attorney for failing to object when the prosecution moved, during trial, to amend the charges against Petitioner.

1.      Failure to Assert an Alibi Defense

Petitioner asserts that his trial counsel improperly declined to present an exculpatory alibi defense. In support of this claim, Petitioner submitted to the trial court statements executed by three individuals: (1) Charlie Pagels; (2) David Purdy; and (3) Thomas Meader.

Charlie Pagels submitted a handwritten, unsworn, statement dated August 31, 2010, the relevant portion of which reads as follows:

> I was Mark Sellers neighbor next door to where he lived Mark and his brother came back from painting a house in I believe Detroit.  The 18 of July in 04.  I helped Mark plant flowers in the flower bed in front of his house.  There were no children around.  They were in New York for vacation for 10 days or so.  On July 19th [A.M.] and Sue and her sister came in the driveway driving a van.  [A.M.] got out of the van[] and stomped the flowers down that we just planted the day before.  This is how mean she was and very distructful (sic).

(Dkt. #25).

David Purdy submitted an unsworn statement dated February 13, 2009, in which he

14

stated the following:

> From June 2004-August 2004, Mr. Mark Sellers, along with his brother Tom, were hired by myself as painters to paint the interior of my home.
>
> Since I live in Washington, Michigan, and they lived on the west side of the state, I offered them the opportunity to stay in the apartment above my garage in order for them to complete the job.  They would arrive Monday mornings and work through the day on Fridays before returning home for the weekend.  This arrangement stayed in effect for the entire 3-month period.

(Dkt. #25).

Thomas Meader submitted a sworn statement, dated August 20, 2010, in which he asserted the following:

> This is regarding the case of Mark Sellers.  Mark and I contracted to paint a house for Mitch Purdy.  From July to August, we would travel to Romeo, Mi[chigan].  Usually from Sunday or Monday to Friday morning and come back home Friday morning.  For the week in question we left Monday morning and returned Friday morning.  We got home about 12 noon, Mark told me that he was going to do a lot of yard work and plant some flowers for Susan before she got back from New York City.  He also stated that he was not getting the kids til she returned.  I don't know anything after he got out of my van.  I did not talk to him til the following Monday.  Three people do know when the kids returned and that is Susan Sellers and her sister Lori Jo and Susan's mother.  I remember that [A.M.] stayed with Lori Jo and [A.M.'s brother and sister] stayed with Susan's mother.

(Dkt. #25).

The Court notes that these statements were prepared well after the conclusion of Petitioner's criminal trial.  Assuming, however, that these statements represent the testimony these individuals would have provided, such do not establish that Petitioner had an alibi.  As noted above, A.M. testified that Petitioner sexually assaulted her while her mother was away at dance camp with

15

one of her siblings.  Petitioner's alibi theory is premised on his contention that this trip occurred during the time he was allegedly painting a house on the east side of the state and, moreover, during which time he was not caring for A.M. and her siblings.  The precise dates of Sellers' dance camp trip, however, is not particularly relevant in light of Petitioner's statement to Detective Mata that he was, in fact, caring for A.M. and her siblings while Sellers was away.  Petitioner also acknowledged to Mata that A.M. was naked in his bed while Sellers was away.  Petitioner did not refute A.M.'s allegations by asserting that he had an alibi, but instead claimed that he could not remember what occurred because he was taking medication which made him feel "funny."  This evidence contradicts Petitioner's alibi theory.

Also before the trial court was an affidavit executed by Brett Naumcheff, Petitioner's trial counsel.  (Dkt. #25).  In his affidavit, Naumcheff asserted the following:

1.      My name is Brett M. Naumcheff and I was the trial counsel for Mark Sellers in the Berrien County Trial Court in 2008.

2.      Based on a letter from Attorney Robert J. Dunn, I am providing this affidavit related to the 6.500 motion and the appeal of Mr. Sellers.

3.      In addition to my contacts, Mr. Sellers did not mention an alibi defense to his initial trial counsel.

4.      In my initial interview and all subsequent personal interviews with Mr. Sellers he stated that he remembered the incident.  He never mentioned an alibi until well into the case and only after it was brought forward by his mother, not Mr. Sellers.

5.      Mr. Sellers and I reviewed the police report in detail on several occasions and Mr. Sellers told me that he told Officer Juan Mata that he remembered the day that Amara work up at the bottom of his bed.  He

further stated that he could not remember what had happened during the night because he took some medication that made him feel funny. He did not mention an alibi when interviewed by police.

6.  Mr. Sellers and I discussed his statement that was given under <u>Miranda</u> to Officer Juan Mata. He said the statement as it was in the police report was factually consistent with his statement to Officer Mata. He did not offer Officer Mata an alibi in his statements to the police.

7.  Mr. Sellers told me that the substance of [the] police report was correct as it relates to his statements to the police and it did not include an alibi.

8.  Carol Thornton called and said that Mark had an alibi as he was painting out of town at the time when the incident occurred. She told me that he was painting the house of Dr. Purdy with his brother Tom. Mark confirmed the painting job and I investigated it.

9.  I called and spoke with Tom Meador. His statement was troubling from the onset. Tom told me that he did not remember until his mom told him but "would say anything you want to help my brother" and "tell me what to say and it[']s done." Upon further questioning, he indicated that he was not sure if Mark had been there every night during the painting job but was sure that he was there on the night she claimed he raped her. Tom indicated that they did not work everyday. As the exact date and time of the incident was not known, it was clear that Tom was willing to provide untruthful testimony and was counting on me to assist him in doing so.

10. I spoke with Charles Pagels at his home in Eau Claire, Michigan. He stated that although he did not know Mark well, Mark was a hard worker and good with the children even though he had knowledge of Mark physically assaulting another step-daughter. He also spoke highly of Amara and mentioned that she would come over and help cook. Mr. Pagels had no

independent recollection regarding an alibi.

11.   During the investigation phase, I interviewed, fourteen people and was denied interview of six others. I personally interviewed Juan Mata, Barbara Wilke, Amanda Sellers, Candice Sellers, Tom Meadow, Charles Wooten, Wanda Wooten, Debbie Schembarger, Cory Peek, James Seitz and four unnamed citizens outside of the [of] Eau Claire Library. Several people refused to be interviewed including relatives Amy Loschbough and Bill Loschbough, Aunt Jo Jo, Susan Sellers and the children of Susan Sellers.

12.   The family of Mr. Sellers offered to pay for a polygraph examination. Initially, Mr. Sellers did not want to take the polygraph examination. His girlfriend eventually paid the money for the polygraph. Mr. Sellers told me that he was sure that he would fail the polygraph and would only take it if I would not disclose to his family and girlfriend the results if he failed. I told Mark that only he, Mr. Swabash and I would know if he failed the exam.

13.   Mr. Sellers was given a polygraph by Howard Swabash a professional polygraph examiner with in excess of 25 years of experience.

14.   According to the report of Howard Swabash, Mr. Sellers did not pass the polygraph and was found to be "deceptive" even though he had been given three opportunities. I spoke with Mr. Swabash who stated that there was no mention or indication of there being an alibi based on his interview with Mr. Sellers and/or the results. It was his conclusion that Mr .Sellers was involved in the molestation allegations.

15.   Mr. Sellers and I discussed the polygraph results and he claimed that he failed because he and Amara were both naked in his bed and he touched her when he carried her back to her bed. He said the physical contact probably occurred when he picked her up and may have inadvertently touched her buttocks in doing

so. Mr. Sellers told me that there was no sexual interest in his carrying her to her bedroom.

16. During the course of the case, after interviews and the polygraph, I spoke with Mark Sellers about my findings. He remembered not staying every night in Romeo but could not remember which nights as it was [] so long ago. Mr. Sellers agreed that although he was there painting it was not every night and the alibi defense was not airtight as we would need, was inconsistent with his statements to the police and had other problems. In addition, once I provided the prosecution with the required notice they would be able [to] poke holes in the defense and we would then be stuck with those negative findings. Therefore, it was decided that our strategy would not include an alibi defense. He clearly understood but asked me never to tell his mother that he was naked in bed with Amara under any circumstances as she would never talk to him again. His girlfriend had already figured out he had failed the polygraph and left him. I told him that she may learn that at trial through testimony of Officer Juan Mata and Amara. He told me that was fine because he told her that Officer Mata and Amara were lying and that Officer Mata lied in his report.

17. I continually discussed and consulted on the overall strategy and specifically my finding as it relates to the alibi with several lawyers including two former prosecutors, a city attorney, a criminal defense attorney, a general practice attorney and a former law professor. My strategy not to continue or present an alibi defense was based in pertinent part on those conversations.

18. I held a mock trial panel roundtable in Lansing, Michigan which again verified the trial strategy decision not to include an alibi defense.

19. Although it came after the trial and his conviction, Mr. Sellers did not mention any alibi in the Defendant's Description of the Offense portion of the Presentence report. He provided a handwritten

> response and never indicated an alibi.  His failure to
> mention an alibi in his handwritten response is
> consistent with my private conversations with Mr.
> Sellers and our strategy not to bring forward the alibi
> defense that was desired by his mother.

(Dkt. #25).

The trial judge denied this particular claim on the ground that Naumcheff's decision to not pursue an alibi defense was "a reasonable move" in light of the unrefuted assertions in his affidavit. *People v. Sellers*, Case No. 2008411644-FC, Opinion and Order (Berrien Cnty Trial Ct. - Criminal Division,, January 27, 2012).  As the trial judge further stated:

> The law does not require a defense lawyer to assert any dubious alibi
> that the client reveals.  At oral argument defendant's current counsel
> basically contended that without the alibi the defense had nothing for
> the jury, and this alibi was better than nothing.  Trial counsel could
> have reasonably concluded that this alibi was worse than nothing.  He
> wisely concluded that the presentation of a shaky alibi claim would
> detract from the arguments he made at trial that the prosecutor had
> failed to meet its substantial beyond-a-reasonable-doubt burden.  The
> People's case rested largely on the recollection of a 10-year-old in
> 2009 about what had happened in 2004, and trial counsel argued that
> the child's recollection was an unreliable foundation on which to
> build a case for conviction of such a serious crime.  He pursued an
> objectively reasonable strategy in rejecting the alibi defense.

*Id.*

It is well established that "reasonable" strategic choices "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010).  The trial judge's determination that trial counsel's decision not to present an alibi defense constituted a reasonable strategic decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, the trial judge's conclusion was not based on an unreasonable determination of the

facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

 2. Failure to Object to Amendment of Charges

Petitioner was initially alleged to have sexually assaulted A.M. "on or about the month of July 2004." (Trial Transcript, November 19, 2008, 8-9).  As noted above, however, Susan Sellers testified that the dance camp trip, during which time Petitioner assaulted A.M., occurred in June 2004. (Tr. 143-44).  Accordingly, at the outset of the third day of trial, the prosecution moved to amend the charges against Petitioner to conform to the evidence. (Trial Transcript, November 21, 2008, 3-4).  Specifically, the prosecution sought to amend the charges to allege that the criminal conduct in question occurred "in or about June 2004." (Tr. 3).  Petitioner's trial counsel conceded that the proposed amendment was permitted under Michigan law. (Tr. 4).  The trial judge granted the prosecution's motion to amend. (Tr. 4).  Petitioner asserts that he is entitled to habeas relief on the ground that his trial counsel failed to object to the prosecution's motion to amend the charges to conform to the evidence.

In support of her motion to amend, the prosecutor relied, in part, on Michigan Court Rule 6.112(H), which provided that the trial court could "before, during, or after trial" allow the prosecution "to amend the information" unless the proposed amendment would "unfairly surprise or prejudice the defendant."  Michigan Court Rule 6.112(H); *see also*, *People v. Jones*, 2009 WL 3013632 at *1-2 (Mich. Ct. App., Sep. 22, 2009).  Apparently discerning no prejudice to Petitioner by the proposed amendment, Petitioner's trial attorney did not object to such.  Petitioner now argues that he was, in fact, prejudiced by the proposed amendment and that in light of such his trial

21

attorney's failure to object deprived him of the right to the effective assistance of counsel.

The Court fails to discern how Petitioner was prejudiced by the amendment in question. As discussed above, Petitioner told Detective Mata that he cared for A.M. while Sellers was away. Thus, whether the trip in question took place in June or July is not particularly relevant. Instead, the relevant question was did Petitioner sexually assault A.M. while Sellers was away. Moreover, to the extent Petitioner argues that the amendment of offense dates precluded him from asserting an alibi defense, such is unpersuasive for the reasons discussed above. The trial judge rejected this particular argument as follows:

> Defendant's new argument based on the time of the offense is nothing more than a red herring. June or July? It matters not at all. Time is not of the essence. What matters is not where defendant was in June or July; what matters is where defendant was at the time his wife was on her out-of-town trip.

*People v. Sellers*, Case No. 2008411644-FC, Opinion and Order (Berrien Cnty Trial Ct. - Criminal Division,, January 27, 2012).

In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Appellate Counsel

Petitioner asserts that his appellate counsel, by failing to request a *Ginther* hearing at which to pursue the ineffective assistance of counsel claims against his trial counsel, violated his

right to the effective assistance of counsel.  Petitioner's appellate counsel, Douglas Baker, submitted

to the trial court an affidavit in which he asserted that Petitioner asked him to consider "raising a

claim of ineffective assistance of counsel based on trial counsel's decision not to present an alibi

defense." (Dkt. #25).  Baker further asserts, however, that "after investigating the issue, I chose not

to present the claim because I thought it lacked arguable merit." (Dkt. #25).  Specifically, Baker

concluded that he did not believe he could establish either prong, deficient performance or prejudice,

of the *Strickland* analysis. (Dkt. #25).  Baker further stated:

> My decision not to pursue the ineffectiveness claim was not made
> lightly.  I spent hours discussing the issue with our investigator, who
> thought it hopeless.  I also consulted my supervisor and a senior
> colleague.

(Dkt. #25).

As discussed above, Petitioner's claim that his trial counsel was ineffective is without

merit.  Thus, Petitioner could not have been prejudiced by his appellate counsel's failure to assert

the issue on appeal.  Moreover, Baker's decision, made after a thorough investigation of the facts

and circumstances, is the very sort of strategic decision which is "virtually unchallengeable."

The trial judge rejected Petitioner's claim on the ground that Baker's decision not to

pursue the ineffective assistance of counsel claim on appeal was "reasonable." *People v. Sellers*,

Case No. 2008411644-FC, Opinion and Order (Berrien Cnty Trial Ct. - Criminal Division, January

27, 2012).  The trial judge's determination that Baker's decision in this regard constituted a

reasonable strategic decision is neither contrary to, nor involves an unreasonable application of,

clearly established federal law.  Furthermore, the trial judge's conclusion was not based on an

unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim

raises no issue upon which habeas relief may be granted.[1]

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Sellers' petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  February 22, 2016                           /s/ Ellen S. Carmody
                                                   ELLEN S. CARMODY
                                                   United States Magistrate Judge

---

[1]  The Court notes that Respondent, in his answer to Sellers' petition, argues that Petitioner is not entitled to habeas relief on the ground that the prosecutor engaged in misconduct. (Dkt. #11 at PageID.111-133). Petitioner, who is represented by counsel in this matter, has failed to assert any such claim before this Court. While Petitioner's initial brief makes reference in the Table of Contents to "rampant prosecutorial misconduct," this argument is not developed or even mentioned in the body of Sellers' petition. (Dkt. #1). While Petitioner asserted a prosecutorial misconduct claim in state court, he expressly indicated in a subsequent pleading that he is *not* pursuing such claim in this Court. (Dkt. #6 at PageID.45).